IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TIFFANY JOHNSON-STOTT,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:17-cv-00391-TC |

Plaintiff Tiffany Johnson-Stott appeals the Acting Commissioner of Social Security's denial of her application for disability insurance benefits under Title II of the Social Security Act. Ms. Johnson-Stott claimed that she was disabled as a consequence of a number of physical and mental maladies. An administrative law judge (ALJ) determined that she suffered from severe medically determinable impairments, but nonetheless retained the capacity to perform light work with some limitations and so denied her application. For the reasons set forth below, the court affirms the Commissioner's decision.

## BACKGROUND FACTS

Application for Disability Insurance Benefits

Ms. Johnson-Stott filed an application for disability insurance benefits under Title II of the Social Security Act, claiming that she was disabled from August 30, 2010, to September 30, 2013, her date last insured. According to her application, she was unable to work as a consequence of post-traumatic stress disorder, anxiety, insomnia, lipoma tumors, fibromyalgia, cervicalgia, chronic back pain, neoplasms of the skin, and pain and tingling in her arms and hands.

Ms. Johnson-Stott's medical records from 2010 to 2013 reflect treatment for each of these conditions. She repeatedly visited her primary care physician, Dr. Ronald Lee, to treat anxiety, neck and back pain, and insomnia. She also visited pain specialists and underwent physical therapy to treat pain in her neck, back, wrists, feet, and ears. In August of 2013, she underwent an MRI, which revealed a "small disc osteophyte" in her neck and "mild degenerative changes of the lumbar spine" in her lower back. (Administrative Transcript[1] ("R.") 347, 349.)

Ms. Johnson-Stott also underwent a number of medical procedures during this time. She gave birth by caesarian section in June of 2013, and, the next month, underwent surgery to remove tumors known as lipomas from her body.

In her initial application for benefits, Ms. Johnson-Stott described "overall pain through out my arms, back, neck, knees, hand, legs, and feet," which "make[s] it impossible to lean over people for any amount of time let alone all day preforming [sic] massage therapy." (R. 166.)

---

[1] As part of Ms. Johnson-Stott's appeal, the Social Security Administration filed a complete record for review. (See ECF No. 8.) The court uses "R." to refer to pages in that record.

She also reported pain performing household chores such as cleaning dishes, picking up her children's toys, sweeping and cleaning, and doing laundry. She stated that "[j]ust to walk I have to hold on to items or my husband to walk around the house or to even use the restroom I have to have him help set me down on the toilet." (R. 167.) Psychologically, she reported debilitating anxiety and panic attacks, and feelings of claustrophobia.

Two state examiners, Dr. Kimberlee Terry and Dr. Louis Huebner, reviewed Ms. Johnson-Stott's initial application. Dr. Terry found that Ms. Johnson-Stott's "reported limits are significantly out of proportion to the [objective] exams." (R. 66.) Dr. Huebner conducted a vocational assessment and concluded that

> [t]here was sufficient enough evidence . . . to determine that you were capable of performing light duty work from a physical standpoint, as found in the national economy. There was not enough evidence to show you were completely disabled psychologically and therefore your claim for disability under Title II benefits is denied.

(R. 67.)

After an initial denial, the Social Security Administration reviewed her application again on reconsideration. Dr. Dennis Taggart, another state agency examiner, concluded that

> [r]eview of the medical evidence indicates the previous decision [denial] was made appropriately. The medical evidence available for review from 08/30/2010, your alleged onset date, to 09/30/2013, the date you were last insured for disability benefits; was insufficient to support any totally disabling condition. No additional medical evidence was received for review from 08/30/2010 through 9/30/2013 to indicate your condition was worse during that time, therefore you [sic] claim is denied.

(R. 80.)

Ms. Johnson-Stott's Appeal before the ALJ

Following denial on reconsideration, Ms. Johnson-Stott requested and received a hearing before an ALJ. The hearing took place in February of 2016.

The record before the ALJ consisted of Ms. Johnson-Stott's medical records and statements from her treating physicians and her husband. Dr. Lee submitted a letter dated June 11, 2015, which stated that Ms. Johnson-Stott "has been seen and treated here for Anxiety, Panic Attacks and PTSD. Tiffany is very limited towards driving and working and doesn't feel comfortable leaving her home unless it is for doctors [sic] appointments or emergencies because being around people triggers the Panic Attacks." (R. 502.)

Dr. William Hough, another treating physician, submitted a letter dated June 16, 2015, which stated that Ms. Johnson-Stott

> suffers from PTSD and MDD with anxiety (Post Traumatic Stress Syndrome and Major Depressive Disorder with Anxiety). These are currently stable on medications but she is very scarred emotionally from event in her life which caused these disorders. Child sex abuse, an abduction and abuse incident while on a humanitarian mission in Ecuador, and finally a mentally and physically abusive first marriage. Tiffany's ability to function in any work or social situation has been severely damaged.

(R. 503.)

Ms. Johnson-Stott's husband, Jason Stott, submitted a third-party "function report" dated December 3, 2013. In it, he wrote that his wife

> is in so much pain for known and unknown reasons, she has trouble sleeping, walking, sitting, standing, dressing herself, bathing herself. I have to walk in front of her as she holds onto my shoulders when she needs to get around, I have to help her sit down on the toilet, chairs, her knees and joints are in so much pain. All this makes her very emotional as she used to be a very active person and now can't get around at all without assistance.

4

(R. 182.)

Ms. Johnson-Stott testified at her hearing, as did a vocational expert. The ALJ asked the vocational expert to assess the functional capacity of a hypothetical individual of Ms. Johnson-Stott's age, education, and work experience, but with certain limitations: the hypothetical individual could work at a light exertional level, but only occasionally climb, balance, stoop, kneel, crawl and crouch, and could interact only occasionally with the public and co-workers. The vocational expert opined that such an individual could not work as a massage therapist, Ms. Johnson-Stott's past occupation, but could perform other jobs in the national economy such as a small products assembler, laundry folder, and plastic medical parts assembler.

Ms. Johnson-Stott's attorney then posed two hypothetical scenarios of his own—first, that the hypothetical individual would be off task approximately fifteen percent of the time due to side effects from medications. The vocational expert opined that "[i]f that were to continue on a sustained basis, was not just a situational issue, it would end up in job loss." (R. 53.)

The attorney then asked the vocational expert to consider that the hypothetical individual would need to take two separate naps in addition to normal breaks and lunch periods, each lasting about an hour, on two days a week. The vocational expert again opined that such a limitation would result in job loss.

The ALJ's Decision

The ALJ found that Ms. Johnson-Stott had severe medically determinable impairments—degenerative disc disease, post-traumatic stress disorder, claustrophobia, and panic with agoraphobia—but that she nonetheless retained the capacity to perform light work, and was thus not completely disabled. While Ms. Johnson-Stott's impairments "could reasonably be expected

5

to cause most of the alleged symptoms," (R. 25), he found that "the intensity and persistence of symptoms as alleged by the claimant were not consistent with the medical record signs and laboratory findings, or the medical record as a whole for the pertinent period." (R. 27.)

In his decision, the ALJ gave "great weight" to Dr. Taggart's review of Ms. Johnson-Stott's application. He wrote that Dr. Taggart, though not a treating or examining physician, was an appropriate specialist, had reviewed much of the record, was familiar with the Social Security Administration's definitions and standards, and that "his assessment is generally consistent with the overall evidence for the relevant period." (R. 27.) The ALJ gave "little weight" to the opinions of Dr. Huebner and Dr. Raps because they did not treat or examine Ms. Johnson-Plott, did not review complete medical evidence, and provided internally inconsistent conclusions regarding her impairment and limitations. (Id.)

The ALJ discounted the statements provided by Ms. Johnson-Stott's treating physicians because they were both dated nearly two years after the relevant time period for evaluating disability, and did not relate to her condition during the relevant time. He gave "little weight" to Mr. Plott's statement, which supported Ms. Johnson-Plott's allegations "but is simply not consistent with the preponderance of the evidence, including the opinions and observations by medical doctors in this case." (Id.)

Ms. Johnson-Stott requested that the Social Security Administration's Appeals Council review the ALJ's decision. The Appeals Council denied her request, making the ALJ's decision final for the purpose of judicial review.

## STANDARD OF REVIEW

The court reviews the ALJ's decision "only to determine whether the correct legal standards were applied and whether the factual findings are supported by substantial evidence in the record." Madrid v. Barnhart, 447 F.3d 788, 790 (10th Cir. 2006); see 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir.2005)). Review is narrow and deferential. The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Vigil v. Colvin, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting Newbold v. Colvin, 718 F.3d 1257, 1262 (10th Cir.2013)

## DISCUSSION

Social Security Act regulations define "disability" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To assess a claim for disability benefits, an ALJ must use a five-step, sequential analysis that evaluates

> whether (1) the claimant is presently engaged in substantial gainful activity, (2) the claimant has a medically severe impairment or impairments, (3) the impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation, (4) the impairment prevents the claimant from performing his or her past work, and (5) the claimant possesses a residual functional [capacity] (RFC) to perform other work in the national economy, considering his or her age, education, and work experience.

Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004) (citing 20 C.F.R. § 404.1520(a)(4)) (footnote omitted).

The claimant generally bears the burden of proffering the evidence used to determine RFC, see 20 C.F.R. §§ 404.1512(a), 404.1545(a)(3), and the burden of showing disability through the first four steps of analysis. At the fifth step, the burden shifts to the ALJ to show "that there are jobs in the regional or national economies that the claimant can perform with the limitations the ALJ has found [her] to have." Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Ms. Johnson-Stott challenges the ALJ's analysis at the fourth and fifth steps of the evaluation process—the steps at which, after determining mental and physical impairments, the ALJ assesses "residual functional capacity" (RFC) and a claimant's ability to either perform his or her past work, or adjust to other work. 20 C.F.R. § 404.1520(a)(4)(iv)–(v). She raises a single issue for review: whether the ALJ's determination of her RFC is supported by substantial evidence.

### I. The ALJ Properly Considered All of Ms. Johnson-Stott's Medically Determinable Impairments.

Ms. Johnson-Stott frames the ALJ's error as a failure "to correctly consider and evaluate the combined and cumulative effects of all of Ms. Johnson-Stott's physical and mental impairments (both severe and non-severe)" in formulating her RFC. (Pl.'s Opening Br. at 13; ECF No. 13.) The court finds no such fault.

If, as here, a claimant for disability benefits suffers from more than one medically determinable impairment, an ALJ must consider the combined effect of all impairments when formulating an RFC, even those that are not severe. See 42 U.S.C. § 1382c(a)(3)(G); 20 C.F.R.

8

§ 404.1545(a)(2). A "medically determinable impairment" is one "that can be shown by medically acceptable clinical and laboratory diagnostic techniques"—in other words, it "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. To formulate an RFC, the ALJ is required to aggregate the limitations stemming from medically determinable impairments, not other alleged impairments. 20 C.F.R. § 404.1545(a)(2); see Cook v. Colvin, No. CV 15-1164-JWL, 2016 WL 1312520, at *4 (D. Kan. Apr. 4, 2016) ("Limitations attributed to impairments which are medically determinable but are not severe must be considered at later steps in the evaluation, whereas alleged limitations attributable to impairments which are not medically determinable must not be considered at later steps.")

In his decision, the ALJ found that Ms. Johnson-Stott only suffered from four severe, medically determinable impairments: degenerative disc disease, post-traumatic stress disorder, claustrophobia, and panic with agoraphobia. He determined that her skin conditions were not severe—they did not "cause any limitation in the claimant's ability to perform certain work activities." (R. 21.) He also determined that Ms. Johnson-Stott's fibromyalgia and hand numbness were not medically determinable impairments because neither met the requirements of relevant Social Security rulings.[2]

From there, the ALJ formulated Ms. Johnson-Stott's RFC. First, despite evidence of degenerative disc disease, the ALJ noted that the record was "devoid of any evidence showing a

---

[2] Ms. Johnson-Stott does not challenge these findings, or the ALJ's determination that the impairments did not, in combination, equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (which would compel a finding of disability without need to formulate an RFC, see 20 C.F.R. § 404.1520(a)(4)(iv)).

9

significant degree of nerve root compression, cord compression, muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or significant reduced range of motion of the spine or joints." (R. 25.) The absence of such evidence suggested that Ms. Johnson-Stott's symptoms "were not as severe as alleged or that the conservative treatment was relatively effective at controlling her symptoms." (Id.) And "many times when the claimant reported low back, hip, or pelvis pain, she was actually pregnant," which "may have exacerbated, or been the case of, her pain for a short period of time." (Id.)

The ALJ's conclusions are supported by substantial evidence in the record. Ms. Johnson-Stott complained of debilitating back pain, but she received only conservative treatments such as prescription medications and physical therapy. Moreover, she only attended four physical therapy sessions between January of 2013 and April of 2013, before being discharged due to "non-return." (R. 291.) And MRI imaging revealed only a small disc osteophyte and mild degeneration. After her MRI, a treating physician refused to prescribe additional pain medication "given the mild findings on MRI imaging." (R. 448.)

Additionally, in notes from various medical appointments spanning the relevant time period, Dr. Lee indicated that Ms. Johnson-Stott retained normal gait and station. Notes from her pain specialist in January and August of 2013 documented normal muscle tone and strength. Certainly, the record indicates that Ms. Johnson-Stott experienced back pain. But it does not support her self-reported functional limitations.

As for mental impairments, the ALJ noted that Ms. Johnson-Stott "did not require inpatient psychiatric hospitalization during the pertinent period," and did not "require or seek frequent emergent or immediate outpatient treatment, which seems to undercut any allegations of

debilitating mental symptoms." (R. 26.) Rather, medical records "generally showed the claimant to be fully oriented, with intact memory and appropriate mood and affect." (Id.)

This conclusion, too, is supported by substantial evidence. Ms. Johnson-Stott consistently reported anxiety, post-traumatic stress disorder, and insomnia, but never sought emergency care or required hospitalization. She only sought treatment from her primary care physician, Dr. Lee, and the medications he prescribed to her appear to have worked without disabling side effects. In early 2012, following a prescription for anxiety medication, Dr. Lee noted that the "[s]everity of [her] condition is gradually improving." (R. 394.) At appointments that followed, he consistently noted that Ms. Johnson-Stott was "[a]lert and oriented to person place and time," that "[r]ecent and remote memory appears intact," and that her "[m]ood and affect seem appropriate to current state." (R. 357; see also R. 363 (same); R. 371 (same); R. 381 (same)).

The ALJ's decision was, at heart, a credibility determination. He found that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible" based on other objective evidence in the record. (R. 25.) And he was required to evaluate credibility in this manner—to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the applicant's] statements and the rest of the evidence," including objective medical findings. 20 C.F.R. § 404.1529(c)(4). So long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility," the court will not disturb his findings. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). He did so here.

11

## II. The ALJ Properly Relied on the Hypothetical RFC He Posed to the Vocational Expert.

In light of the evidence before him, the ALJ concluded that Ms. Johnson-Stott had the residual functional capacity to perform light work, but could only occasionally climb balance, stoop, kneel, crouch, and crawl, and could only occasionally interact with the public and co-workers. (R. 24.) Ms. Johnson-Stott contends that the ALJ failed to consider two additional limitations that her attorney presented to the vocational expert at her hearing: (1) that she would be "off task approximately 15 percent of the time" due to side effects from medication; and (2) that she would need, on two workdays per week, to take two unpredictable hour-long naps.

But just as the ALJ properly formulated his operative RFC, he properly disregarded these two hypothetical limitations. Hypothetical questions posed to a vocational expert "should include all—and only—those impairments borne out by the evidentiary record." Bean v. Chater, 77 F.3d 1210, 1214 (10th Cir. 1995). An ALJ is "not required to accept the answer to a hypothetical question that include[s] limitations claimed by [a] plaintiff but not accepted by the ALJ as supported by the record." Id.

Ms. Johnson-Stott's medical records do not evince side effects from medications. To the contrary, at an October 2013 appointment with her pain specialist, Ms. Johnson-Stott denied "any adverse effects" from her medications and stated "that the medications allow [her] to be functional and improves [her] quality of life." (R. 452.)

The ALJ also properly disregarded her attorney's hypothetical nap limitation. Ms. Johnson-Stott testified that she took a nap "probably every day" between 2010 and 2013. (R. 51.) She testified to taking additional naps "[a] couple times a week," (Id.), but it is not clear that she did so during the relevant time period. Regardless, there is no indication from her

testimony or medical records that she needed to take unpredictable naps on an ongoing basis, as her attorney suggested to the vocational expert.

## ORDER

The court finds that the ALJ's decision is supported by substantial evidence. Accordingly, the court AFFIRMS the Commissioner's denial of Ms. Johnson-Stott's claim for disability insurance benefits.

DATED this 24th day of April, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge